Not ousted<br>by the stat-<br>ute.

---

## SEESEL et al. vs. EWAN et al.

TRUSTEE'S SALE:   *His purchase at, for the beneficiaries.*
   The beneficiaries in a trust can not make the trustee their agent to purchase
   the trust property for them at the best advantage, but they may send him
   their bid, and request him to sell them the lands at the sale if no one
   will bid more; and he may do so without any breach of trust.

APPEAL from *Prairie* Circuit Court in Chancery.
Hon. J. N. CYPERT, Circuit Judge.
*Clark & Williams,* for appellants.
*Hughes, contra.*

EAKIN, J.   Complainants, A. Seesel, Son & Co., filed this
as a creditors' bill, in behalf of themselves and other cred-
itors of the estate of J. W. Harrell, deceased, whose debts
had been probated, allowed and classed. It sought to reach
lands, as assets of the estate, which, it claims, were fraud-

ulently sold in 1874 by the trustee in a deed of trust, exe-
cuted by Harrell in the spring of 1873, to secure Messrs.
Harris, Mallory & Co., of Memphis, in a debt of about
$5,000. The trustee, the beneficiaries, the widow and heirs,
as well as the administrator of Harrell, were all brought in
as defendants.

The bill set forth the deed of trust, duly executed by
Harrell and wife, conveying about 400 acres of land, all
lying in the same neighborhood, but not entirely in a body,
together with some lots in Des Arc. It does not controvert
the validity of the deed, or the debt it was made to secure,
but charges that the whole property was unfairly sold in a
mass by the trustee, at an inadequate value, and purchased
by him for the secured creditor. It charges, further, that
the purchase was so made upon a secret trust to allow Har-
rell to redeem, and, upon redemption, to have title to his
wife.

That there was a considerable number of creditors of
Harrell at the time of the sale, whose claims were in the
hands of an attorney for collection, and that the trustee
refused an application on behalf of other creditors to sell
the property in parcels, whereby it would have brought
more than the debt, and would have left something for the
other creditors. The gist of the charge is that the pro-
ceedings under the deed of trust had been in fraud of the
interest of the other creditors, and detrimental.

It is further charged that said firm of Harris, Mallory &
Co. had been otherwise paid a large portion of their debt
by shipment of cotton from Harrell. Harrell afterwards
died, and letters of administration were granted on his
estate to defendant Williams.

The bill was filed in January, 1877, when the defendants,
Harris, Mallory & Co., had been three years in the enjoy-

Seesel et al. vs. Ewan et al.

ment of the rents and profits under their purchase. It seeks to avoid the sale, and to have the property resold to pay what may be actually due on the secured debt, after holding defendants responsible for net profits, and to have the balance of the proceeds divided amongst the probated claims as classified, and for general relief.

Harris, Mallory & Co. and the trustee answered, denying all the material allegations as to fraud, and insisting on the fairness of the transaction. The cause was heard upon pleadings and proof, and the Chancellor dismissed the bill for want of equity.

Complainants appealed.

About the actual facts of this case, there is little controversy. Harrell, in the spring of 1873, owed Harris, Mallory & Co., of Memphis, about $5,000, and gave the deed of trust to secure it, with power of sale, upon thirty days' notice, to pay the debt.

At the same time, they agreed to furnish Harrell with further supplies and goods, to be paid by further shipments of cotton, and did so furnish them. The balance of the shipments of cotton after paying the new bills, was credited on the secured debt, which was thus reduced to about $4,400. In the spring of 1874 the whole property was advertised by the trustee to be sold for the payment of this debt.

Harrell had become much embarrassed; owed many other debts, and had little other property. The debts had, many of them, come to the hands of Gatewood, an attorney, for collection. It is not shown that any of the claims were liens upon the land. Gatewood says that upon two of them, not held by the plaintiffs in this suit, he had obtained judgments, without specifying whether they were before a magistrate, or where. The debt of complainants

was, then, a simple *contract debt*. They did not obtain judgment till 1876.

Gatewood attended the sale and had with him about $2,000 of his own money, which he was willing to use for the benefit of his clients; and believing that if the land was put up in small parcels, he could, by bidding on separate tracts, stimulate competition and make the whole bring more, he requested the trustee to put it up in separate parcels. The trustee declined, stating that his instructions were to sell in a body.

He further said that all that Harris, Mallory & Co. wanted was the debt. That he was instructed to bid that for it, and if any body gave more they could get the property. He put it up *"en masse,"* announced the bid, and, no one giving more, sold it to one of the members of the firm for the debt. He afterwards made them a deed, and they went into possession.

There is no evidence that defendants, Harris, Mallory & Co., had any agency in directing the mode of the sale, further than to inform the trustee of their bid of the debt, and that it was all they desired.

Nor is there any evidence, *binding on them*, that they had any collusion with any fraudulent purpose, on the part of Harrell, to have the lands sacrificed, nor of any agreement, on their part, to hold the lands in trust for Harrell, or his wife. The evidence tends to show that it was Harrell who insisted on having the property sold together, and not the beneficiaries, Harris, Mallory & Co.

The evidence as to the value of the property is conflicting. Some witnesses say it was estimated to be, and one that it actually was, worth $10,000, one says $8,000, others not more than $6,000. The result of all the testimony does not make it clear that the property would have been

apt to sell for more than $5,000 cash, even if it had been divided. There is evidence to show that the *lands* brought as much in a body as if sold separately; although there is no reason why the *lots* and *warehouse* should have not been sold separately.

There is evidence to show that the latter were worth $450, although none to show that any one desired to bid for them separately, at the sale, or would have given that much cash. Gatewood demanded, generally, that the land should be sold in separate parcels, without indicating any particular portion which he wished to purchase. There is no allegation nor proof that there was any one attending the sale who wished to purchase any particular tract, at any price. Gatewood offered, on behalf of his clients, to bid the debt for the whole property if the trustee would wait for the money until he could draw for it. This the trustee declined. The whole effect of the allegations and proof is, that if the lands had been sold separately, they *might* have brought more, but if they had, there is nothing to show that the surplus would have inured to the benefit of complainants, or any others in whose behalf they sue. None of them appear to have then had liens, either by judgment of a court of record, or by attachment, or otherwise. Gatewood, their attorney, could not have taken the surplus, if the lands had sold for $10,000. It would have gone to Harrell, and might have been expended by him before his death. No grounds for attachment are shown.

The proof does not sustain the allegations of fraud on the part of the defendants, Harris, Mallory & Co., but shows pretty clearly that Harrell, the debtor and grantor, was anxious that the property should be sold *en masse*, and that it should be purchased for the debt. He entertained hope that Harris, Mallory & Co. would allow him to redeem

TRUSTEE'S SALE: His purchase at, for the beneficiaries.

and convey title to his wife.    There is absolutely nothing, however, to connect them with any such purposes.    In receiving their bid, and crying it, the trustee committed no breach of trust.    It was his duty to do so.    They had the right to bid for the lands.    They could not have made the trustee their agent to purchase it in at the best advantage; but they could send him their bid, and request him to sell them the lands if no one offered more.    This is not within the purview of the prohibition, against trustees, from purchasing for themselves or others.    It involves no conflict of duty.    It gave no discretion to the trustee as agent.

The trustee should have sold the property to the best advantage of the grantor in the deed, and those claiming under him, subject to the creditor's right to his secured debt.

His fiduciary obligations extended no further.

Holders of liens, by contract, judgment or attachment, would have stood in the shoes of the grantor, and might have required of the trustee so to conduct the sale as to protect their junior rights.

But in this case the grantor having the right to control the surplus, might waive the means of producing it.    The creditors had no vested rights *in rem*.    They may indeed complain of any action on the part of the debtor calculated to cheat, hinder or delay them, just as general creditors may complain of any sale made by any debtor for that purpose.    They stand as if no deed of trust had been made at all, nor sale by the trustee, but as if Harrell had himself conveyed the property to Harris, Mallory & Co. *in solido* for the debt.

In such case it would be necessary to show actual fraud on the part of Harrell, in which the purchasers had participated, either by direct evidence or circumstances from

which it might be presumed. A sale for a grossly inadequate consideration is almost conclusive on this point, but not a sale *in solido*. A debtor in failing circumstances, with no leins on his property, may honestly sell several pieces of property together if no secret trust be intended.

The adequacy or inadequacy of the consideration is to be considered only as it raises a presumption of fraud, in which the buyer participated. Otherwise human transactions would not be safe. No man could buy at a bargain without the rish of having the property afterwards taken by general creditors of the vendor, whilst he would be compelled to suffer any depreciation. It is enough to require good faith of purchasers and that they respect existing heirs, general or special, of which they have notice. The question here presented is simply one of good faith on the part of the principal defendants.

The cases which hold trustees to strict care in the conduct of sales, to make the property bring as much as it reasonably may, are those in which the rights of the *cestui que trust* are concerned, or of those who at the time claim interest under him.

Mere creditors are strangers to the trust, as such, having the same rights against the property and debtor as they would have if he were selling directly without the intervention of a trustee, and no more. Perhaps if a fraud were committed against the grantor in a deed of trust by the trustee, and purchasers, subsequent judgment creditors on bill filed, might be let into his rights to attack the sale, for the augmentation of the surplus; but that is not this case. The question is simply one of *bona fides* on the part of Harris, Mallory & Co., in the consideration of which the adequacy of the price forms an element. The case stands as if Harrell himself had declined selling in parcels

Seesel et al. vs. Ewan et al.

to any one, and had sold all at once to defendants. Whether this be fraudulent or not depends on circumstances and the intention of the parties.

In considering questions of fact, Chancellors, like jurors, are compelled to avail themselves of their general knowledge of practical affairs. Considering the high rates of money in the country, and the common difference between cash and credit sales of valuable property, the Chancellor might well have failed to see any gross inadequacy in the price given. It is probable that the property could not have been sold for over $5,000 in cash, although one witness says it was worth $10,000. Others estimate it much lower. One witness says that, sold in the usual way, the land was worth about $8,000, but even under favorable circumstances, would not have brought at auction, for cash, over $5,000. Another (Hughes) did not think it *worth* $6,000, and that it never would have brought more than $5,000 in cash. The proof tends to show also that the lands would sell better together as one place, although one eighty-acre tract was detached. The lots in Des Arc are valued at $450. How much they would bring at cash sale is not stated, but perhaps much less. The advertisements were duly made, and notice of the sale was given. It was made known that Harris, Mallory & Co. would only bid their debt. Any one willing and able to give more, had every encouragement to bid. If what a thing will bring in open market, on fair exposure to sale, be any criterion, it can not be thought that a sum of $4,400 was so inadequate as to raise presumption of fraud in the purchaser.

There is no proof that any one else desired to purchase a foot of the property. Gatewood did not. He had about $2,000 which, to promote the supposed interests of his

Seesel et al. vs. Ewan et al.

clients, he wished to use for the purpose of stimulating competition in bidding. If he was willing to risk this in promoting the interests of his clients, it was commendable in him as their agent; but its effects were merely speculative. How far he would have gone or what would have been the result of the experiment is conjectural. He did not seem to desire the land itself or any part of it. He offered nothing except to purchase all if time were extended. How long a time is not specified. There is no proof that there was any other person present who would have bid anything for any part if it had been so put up.

It is true as urged that sales by trustees, *in pais*, under powers, are narrowly watched. They may be oppressive and are not encouraged. If application be made in reasonable time, they will be set aside on slight equities. But this jealousy is not to be indulged beyond reason. The practice is common and much of the property of the country is held under such sales. They facilitate business. They should be sustained when made in strict pursuance of the powers, in good faith, and without detriment to vested rights in the property. Actual fraud on others always depends upon the circumstances of the case and calls for redress when discovered. But it would seriously impair the business of the community to scrutinize sales under deeds of trust so severely, as to amount to a prohibition.

The defendants seem to occupy unimpeachable ground. They had taken a security of *all* the property. The terms of the trust did not require a *part* to be sold. Any junior incumbrancer, by redeeming, or any contract creditor, by bidding their debt, might have taken their shoes. They were under no obligations to be active in securing the

claims of other creditors. They had a right to stand on their security and demand their debt. Their instructions to the trustee amounted to no more than that. Beyond that, they threw no impediments in the way of others. If lands had fallen and the purchase had become a losing bargain, they would have suffered the loss. It would be hard if three years afterwards they should be held to account for the rents and profits of property they had held and managed as their own. The bill seeks to compel them to do this. To credit the profits on their expenditure of purchase-money, and to allow the *corpus* of the property to fall back to the estate of Harrell for the benefit of general creditors. This would be making them mere agents of others, working to increase the assets of the estate at their own risk. Such measure of justice is the severest known to a court of chancery, and would have been due to them, if they had caused the property to be sacrificed against the interests and wishes of junior incumbrancers, or of Harrell. He, or his heirs, or creditors, might then have sought this redress; and a court of chancery would have responded quickly to the invocation.

It is to guard against such oppression that the jealousy of the court is awakened. But to justify so harsh a procedure, there should be *mala fides*, or culpable negligence, with a disregard of the rights of others. The Chancellor could not find that in their conduct. Nor can we.

No less measure of relief would be apt to inure to the benefit of complainants; and as to them would be futile. No third-class creditors have joined in the bill nor applied to be made parties. Their aggregate debts exceed $2,600. They ask nothing, yet their claims would be apt to absorb any surplus of the proceeds of a re-sale of the property

over the original debt of defendants, if the latter are not held to an account of profits.

Upon the whole case the bill was properly dismissed.

Affirm.